STEPTOE, JUDGE:
The claimant brought this action for damages resulting from an alleged breach of contract for the purchase of coal at the respondent’s Morgantown campus. The Court is of the opinion that the respondent acted in a commercially reasonable manner within the provisions of the Uniform Commercial Code, and denies the claim as stated more fully below.
On or about May 26, 1987, the claimant and the respondent (Board of Regents) entered into a contract whereby the claimant agreed to furnish to the respondent the annual coal requirements for West Virginia University’s three heating plants in Morgantown. The contract provided that the claimant would provide an estimated 30,000 tons of coal, at the price of $28.94 per ton, from June 1, 1987, to May 31, 1988. The contract was thereafter renewed for a period of one year, beginning June 1, 1988. Under the general conditions of the contract the claimant was to maintain a stock pile of coal at the three named West Virginia University locations as follows:
Medical Center Heating Plant - 800 tons;
Beechurst Heating Plant - 600 tons;
Evansdale Heating Plant - 300 tons.
At some point in late May or June 1988, the respondent notified the claimant that it would no longer accept coal for its heating plants. The evidence adduced at hearing established that the respondent’s coal-fired heating plants had been violating particulate emissions standards set by the WV Air Pollution Control Commission, hereinafter the Commission. In order to remedy the situation, the respondent had been converting the boilers in the three heating plants to bum natural gas. Pursuant to the terms of a consent decree with the Commission, the respondent agreed to convert the boilers to natural gas by January 15, 1989. The evidence at hearing established that this natural gas conversion was the primary reason that the respondent declined further coal shipments from the claimant. The last shipment of coal was delivered to the Medical Center plant on or about May 23, 1988.
It was the claimant’s position that the respondent breached the renewal contract by declining further coal shipments after June 1, 1988. The claimant alleged damages in the amount of $60,000.00, representing a profit margin of two dollars ($2.00) per ton on the estimated annual coal requirement of 30,000 tons. The respondent’s position was that its decision to discontinue coal shipments was made in good faith in accordance with the provisions of the West Virginia Uniform Commercial Code WV Code §46-2-306 and the aforementioned consent decree. •
DISCUSSION
*116 The evidence adduced at hearing established that the respondent’s coal-fired heating plants had been in violation of WV Pollution Control Commission emissions standards for some time prior to the alleged breach of the renewal contract in late May or June 1988. The claimant was aware of this ongoing problem and during the 1987 and 1988 endeavored to persuade the respondent to install flue gas recirculation systems at its heating plants in order to continue to burn coal with less pollutant emissions. The claimant offered to finance the installation of this new technology, which could have resulted in significant short-term and long-term savings to the respondent. The evidence indicated that during the relevant time period, the cost difference between burning coal and natural gas ranged between approximately $2.00 and $4.00 per million BTU. The savings from burning coal as opposed to natural gas were estimated at up to $968,000.00 per year.
The evidence established that the respondent declined the claimant’s offer because the Commission was unable to certify beforehand that the flue gas recirculation system would comply with the air pollution emission standards. Instead the respondent contracted with Hope Gas, Inc., as its primary supplier of natural gas at its heating plants and its principal agent in charge of the natural gas conversion.
At some point in January 1988, a dispute arose between the parties regarding the quality of the coal provided by the claimant. The evidence was that the respondent conducted on-site tests which revealed, among other things, high ash and sulfur contents. Quality Marketing president Jeff Votaw testified that these problems were remedied by March 1988, when he switched to a different coal supplier. He stated that the alleged damages were limited to lost profits in the amount of $60,000.00, based upon an anticipated 30,000 tons of coal to be delivered on the renewal contract. His testimony indicates that claimant suffered no direct out-of-pocket loss as a result of the respondent’s conduct.
Mr. Votaw testified that prior to the 1987-1988 contract period, he had been providing approximately 30,000 tons of coal annually to the respondent under a similar agreement. However, the evidence established that Quality Marketing provided only approximately 11,000 tons of coal during the 1987-88 contract year. The evidence established that in 1987 Mr. Votaw was well aware of the University’s emissions problems and had reason to know that the respondent’s coal requirements might diminish significantly in the near future. Mr. Votaw testified that he knew in the summer of 1987 that the conversion to natural gas was inevitable.
WV Code §46-2-306(1) of the Uniform Commercial Code governing requirements contracts provides as follows:
A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.
The official comment provides that the party who will determine the quantity is required to operate his plant or conduct his business in good faith so that his output or requirements will approximate a reasonably foreseeable figure. The comment also states that reasonable elasticity is envisaged, and good faith variations from prior requirements are permitted even when variation may result in discontinuance. The statute and comments do not clearly distinguish between quantity decreases or increases and the Court finds it unnecessary to speculate on this matter.
*117 After careful review of all the evidence, the Court is of the opinion that the respondent’s coal requirements for the period governing the contract renewal diminished to zero as a direct and proximate result of the unlawful emissions from its coal-fired heating plants and the ensuing consent order with the WV Air Pollution Control Commission. The Court finds that the respondent conducted its affairs at all times in good faith and that the claimant knew or had reason to know that the respondent’s coal requirements for the 1988-89 contract renewal period would be unpredictable, at best. Therefore, in view of the foregoing, the Court does hereby deny the claim.
Claim disallowed.